CAMEL MANUFACTURING COMPANY

v.

The UNITED STATES.

Nos. 608–71, 38–72, 441–73.

United States Court of Claims.

Feb. 22, 1978.

Peter M. Kilcullen, Washington, D. C., attorney of record, for plaintiff. Kilcullen, Smith & Heenan, and John T. Koehler, Hudson, Creyke, Koehler & Tacke, Washington, D. C., of counsel.

Lenore C. Garon, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Gerald D. Freed, Washington, D. C., of counsel.

Before LARAMORE, Senior Judge, and KUNZIG, and BENNETT, Judges.

## OPINION

KUNZIG, Judge.

These renegotiation cases come before the court on defendant's exceptions to the

findings of fact, conclusions of law, and recommended opinion issued by Trial Judge Louis Spector on November 18, 1976, in accordance with Rule 134(h), in which he held that Camel Manufacturing Company (Camel or plaintiff) had realized no excessive profits during the fiscal years in issue. Plaintiff initially brought these actions seeking redetermination of orders of the Renegotiation Board (the Board) that plaintiff had realized excessive profits on Government contracts, during its 1966, 1967 and 1968 fiscal years (review years) in respective amounts of $200,000, $600,000 and $575,000 [1]. Plaintiff was successful in its redetermination efforts before the Trial Judge (who reduced the excessive profits to zero), and defendant now argues to this court that the decision of the Trial Judge should be, in effect, reversed on several grounds and that a judgment should be entered against plaintiff for at least the full amount of the aggregate excessive profits as determined by the Board, $1,375,-000 [2]. We can agree totally with neither the plaintiff (and the Trial Judge) nor the defendant, and hold, for the reasons stated below, that plaintiff realized a total of $889,611 in excessive profits for the three review years. All facts necessary to the decision are contained in this opinion.

The Camel Manufacturing Company was established as a proprietorship in 1923 and was incorporated under the laws of Tennessee in 1946; its principal place of business remains Knoxville, Tennessee. In 1949, it undertook what was to remain its primary activity through the early 1960's, the manufacture of tents and other canvas products for defense agencies of the United States Government. Although its main production consisted of larger canvas items, it also manufactured such diverse items as duffel bags, packs, and mattress covers.

Beginning in 1960, with the installation of Gene B. Laxer as president and general manager, Camel began a long-range growth

---

1. Total profits on renegotiable sales during the review years as determined by the Board were $523,595, $939,733 and $1,024,736 respectively.

2. The Government counterclaimed for at least the $1,375,000 determined excessive by the Board and argued at trial that Camel realized more than $1,800,000 in excessive profits.

program which included extensive entry into the commercial tentage and camping equipment market, which it had previously explored only peripherally. By 1963, commercial sales volume had increased so significantly that plaintiff was forced to expand to meet the rising commercial demand. This expansion consisted of enlargement of existing production facilities as well as rental and construction of new facilities. After that time, the commercial segment of plaintiff's business continued to grow rapidly in comparison with its defense agency business.

In fiscal years (FY) 1966, 1967 and 1968, plaintiff accepted sizeable contracts, awarded by the Defense Personnel Support Center (DPSC), for military tentage items. Profits earned' under these contracts were subject to the provisions of the Renegotiation Act of 1951 (the Act), 50 U.S.C. App. §§ 1211–24 (1970).

By the terms of plaintiff's review year contracts with DPSC, plaintiff was obligated to use certain Government furnished property (GFP)[3], in the nature of tentage materials such as canvas and webbing, in the manufacture of tents. The Trial Judge found that the value of the GFP utilized by plaintiff in specified FYs was as follows:

| FY 1964 | $ 825,321 |
|---|---|
| FY 1965 | 1,560,541 |
| FY 1966 | 2,173,601 |
| FY 1967 | 3,309,197 |
| FY 1968 | 3,221,823 |

Neither party takes exception to these figures and our review indicates no reason to disturb them.

As stated above, the contracts during the review years were subject to renegotiation. In the instant cases, the Board entered three unilateral orders against Camel, directing refunds of the following amounts as excessive profits allegedly earned in the three review years:

| FY 1966 | $200,000 | Order of May 28, 1970 |
| FY 1967 | 600,000 | Order of November 4, 1971 |
| FY 1968 | 575,000 | Order of August 27, 1973 |

These three orders are now on appeal before this court, pursuant to § 108 of the Act which provides for de novo review.

The record emphatically demonstrates that, from the time of its inception, this action, combining for purposes of redetermination the separate suits filed for each of the review years, was difficult and complex. The plaintiff and defendant could agree on only four, relatively minor, stipulations and, seemingly, every other fact or figure became a bone of contention between the parties. With so many facts contested, the relative burdens of proof assumed vital importance.

The burdens of proof of each of the parties to a renegotiation proceeding in this court were first delineated in the landmark decision in *Lykes Bros. S.S. Co., Inc. v. United States*, 459 F.2d 1393, 1401–03, 198 Ct.Cl. 312, 327–30 (1972) [hereinafter cited as *Lykes Bros.*]. In *Lykes Bros.*, this court clearly divided the burden of proof, and the consequent risk of non-persuasion, between the parties, requiring each to carry the burden at a different stage of the proceedings.

■ Plaintiff's burden, whenever there is a dispute concerning financial data, is to go . . . forward with evidence proving the accuracy of the financial data, including the segregation of the accounting on renegotiable business from non-renegotiable business and the propriety of plaintiff's cost . allocations under accepted accounting principles. *Lykes Bros.*, 459 F.2d at 1401, 198 Ct.Cl. at 326.

■ Plaintiff also has the burden of pleading the statutory factors upon which it relies for favorable consideration and of establishing a *prima facie* case under each; however, this court, in an "exercise of discretion," has held that this is only an initial burden and that, once plaintiff has pleaded these factors and established its *prima facie* case, "the burden shifts to the Government to prove that plaintiff's profits were excessive and the extent thereof." *Lykes Bros.*, 459 F.2d at 1402, 198 Ct.Cl. at 327.

---

**3.** The items supplied by the Government consisted of canvas products which were utilized in the final manufacture of tents. Though Government furnished material (GFM) would also be an appropriate designation, we shall term these items, as did the Trial Judge— Government furnished property (GFP).

As is indicated by this division of the burden of proof, we understand renegotiation cases to consist normally of two distinct analytical categories:

I. ACCOUNTING DETERMINATIONS
 A. Total Dollar Profits
 B. Profits as a Percentage of Sales
II. ARE PROFITS EXCESSIVE?
 A. Appropriate Standards of Comparison
 B. Statutory Factors

A brief analysis of the meaning of these four vital headings might well help our discussion at this point:

## I. ACCOUNTING DETERMINATIONS

A. *Total Dollar Profits:* This portion of the case is devoted to ascertaining how many dollars of profit the contractor actually earned on his renegotiable contracts. As the *Lykes Bros.* court pointed out, this may often be a stipulated fact, based on figures submitted by plaintiff or obtained by defendant's audit from plaintiff's books. It may, however, be an item of dispute to be resolved at trial. In any event, a dollar figure representing the plaintiff's renegotiable profit is a first step in any renegotiation proceeding.

B. *Profits as a Percentage of Sales:* In order properly to compare the dollar profit figure obtained, it must be converted into figures which relate to other manufacturers' or other years' profit figures. This is most frequently done by comparing the dollar profit figure to the total sales figure to obtain a percentage profit figure which can then be related to other percentage profit figures. In this step of the process, the inclusion or exclusion of GFP in total sales plays a central role, since a smaller total sales figure (with GFP excluded) would make a constant dollar profit figure become a larger percentage profit.

## II. ARE PROFITS EXCESSIVE?

A. *Appropriate Standards of Comparison:* Once a percentage profit figure is determined, it must be compared to some other figures to determine excessiveness. Much of the litigation process in this, and other cases is concerned with ascertaining the relative merits of each of many asserted comparisons. In selecting the proper comparisons, the similarity between the asserted standard and the contractor's renegotiable operations is of utmost importance. Once the more appropriate standards are delineated, the apparent excessiveness of plaintiff's profits can be determined by comparison with the standard profits.

B. *Statutory Factors:* Although plaintiff's profits may appear high upon initial comparison to the standard, we are directed by the Act, as the final step to this process, to give consideration to certain "statutory factors"[4] in determining whether or not these profits are in fact "excessive." High profits may not be "excessive" profits if they are justified by a statutory factor.

### The Trial

Difficulties in this case arose at each stage of the proceedings. Plaintiff entered the trial with a set of financial figures which had been substantially revised from its initial filings with the Renegotiation Board[5] and from its own books as they had appeared at the time of the Government

---

4. The "statutory factors," provided by the Act, listed in the order in which we shall consider them, *infra*, are:
 (1) Efficiency
 (2) Net Worth (and capital employed)
 (3) Extent of Risk Assumed
 (4) Nature and Extent of Contribution to the Defense Effort
 (5) Character of Business
 (6) Reasonableness of Costs and Profits
 (7) Other Factors (as required by the public interest and fair and equitable dealing)
50 U.S.C. App. § 1213(e)(1970).

5. Plaintiff had filed the required forms RB–1 with the Renegotiation Board for each of the review years. It was not until Renegotiation orders were handed down by the Board claiming plaintiff owed large sums to the Government for excessive profits for two of the three years that plaintiff sought to change its figures and amend its RB–1s. The Renegotiation Board Form 1, "Standard Form of Contractor's Report," delineated in 32 C.F.R. § 1427.-702(d)(1976) is the vehicle by which renegotiable contractors file their financial statements with the Board. 32 C.F.R. § 1470 (1976).

audit for renegotiation purposes. Plaintiff's new figures were, of course, far more favorable to plaintiff's cause, showing much smaller dollar figures for net renegotiable profits and much larger figures for net commercial profits. This was largely the result of a reallocation of costs to its renegotiable from its nonrenegotiable work. In addition, plaintiff's pre-trial accounting figures included the value of the GFP in arriving at the total volume of the renegotiable contracts, against which dollar profits had to be compared to arrive at percentage profits. This inclusion, of course, had the effect of lowering plaintiff's apparent percentage profits.

Much of plaintiff's effort at trial was absorbed in introducing these figures into evidence through the testimony of a Mr. Bone, an accountant, and Mr. Laxer, Camel's president. Plaintiff also produced the testimony of Mr. Laxer and officers of several other companies (which made related products) which seemed calculated to achieve a favorable "statutory factors" comparison.

Finally, plaintiff argued that, because its profits were lower than the Government's assertions (in both dollar and percentage figures), because its profits appeared low under all asserted comparisons, and because the statutory factors analysis showed many points favorable to the renegotiated contractor, the court should determine that plaintiff had realized no excessive profits during the review years.

Defendant, on the other hand, introduced as its accounting evidence figures derived from the original, sworn RB–1s which were filed by Camel with the Board for each of the review years and from audits of Camel's books. These figures were supported by the testimony of an FBI agent who had performed audits of Camel's actual records

for the review years. Defendant excluded the value of all GFP in computing the total renegotiable sales against which dollar profits had to be compared to arrive at percentage profits. This, of course, resulted in a much higher percentage profit than had been indicated by plaintiff's pre-trial accounting figures. Defendant then put on the stand its expert witness, Mr. Katz, who proceeded with an analysis of the percentage profit figure obtained by the Government and how he had compared this figure, against the background of the statutory factors, against figures from Camel's "base years," [6] in determining which profits were excessive. Defendant also introduced testimony of several other witnesses in an attempt to meet its burden with regard to specific statutory factors.

After an extensive trial, the Trial Judge entered 180 specific findings of fact and produced a recommended opinion which totaled 93 pages. The extensiveness of this fact finding process, together with the length of the opinion, indicates not only the factual difficulty of this case, but also the lack of analytical clarity which still exists in areas of the renegotiation field.

### The Appeal

The defendant excepted to this recommended opinion and to the findings of fact and conclusions of law. Having previously discussed the relative burdens of the parties, we will attempt briefly to summarize the Trial Judge's opinion and the arguments of the parties on appeal to avoid placing an excessive burden on the reader.

### I. ACCOUNTING DETERMINATIONS

A. *Total Dollar Profits:* The Trial Judge, in his own novel approach to the *Lykes Bros.* opinion, placed *only* a burden of going forward with some evidence on the plaintiff in both Parts I and II of this case.[7]

---

**6.** Camel's FYs 1964 and 1965 were utilized by defendant as "base years" against which "review years" could be compared.

**7.** The Trial Judge began his reasoning with the statement that: .

In accordance with the holding of this court in *Lykes Bros. S.S. Co., Inc. v. United States* plaintiff has the initial responsibility of going forward with its evidence in renegotiation, as

in all cases. But in renegotiation cases, once it has produced accounting data showing its receipts, costs, and profits, and has brought forward testimony and exhibits demonstrating the so-called "statutory factors" under the Act upon which it relies for favorable consideration, the burden of proof and the risk of non-persuasion as to the existence of and the extent of excessive profits, if any, remains on the defendant.

Utilizing this unprecedented approach, it is not surprising that he incorrectly resolved most accounting issues in favor of the plaintiff.

Plaintiff's new accounting data, based on special allocations (created *after* Camel had been before the Board for FYs 1966 and 1967) was allowed into the record by the Trial Judge based on the testimony of plaintiff's recently hired comptroller and its president, Mr. Laxer, who was admittedly unskilled in specialized accounting techniques. Though this testimony was highly generalized and often not based on specific personal knowledge,[8] the Trial Judge determined that it was sufficient to meet plaintiff's burden of "pleading."

On the other hand, the Trial Judge rejected defendant's accounting, which was based on an audit of plaintiff's original, basic documents (in sharp contradistinction to plaintiff's new accounting which was based only on general allocations) and offered into evidence on the testimony of defendant's FBI auditor, who had personally inspected Camel's books, where they were available.[9] He further noted that the auditor justified his figures only on the ground that they were taken "directly from plaintiff's cost accounts . . . ." Such justification, the Trial Judge determined, was not sufficient to carry defendant's burden of disproving the figures which plaintiff had introduced into the record.[10]

Just how significant the sum total of all the Trial Judge's accounting determinations in favor of the plaintiff actually were may be seen by comparing the Government's figures with those found to be accurate by the Trial Judge.

Defendant's accounting showed the following picture:

| | Renegotiable (000 omitted) | | | | Nonrenegotiable (000 omitted) | | | |
|---|---|---|---|---|---|---|---|---|
| | *Sales* | *Costs* | *Profits* | *Profit* | *Sales* | *Costs* | *Profits* | *Profit* |
| 1966 | 2,780 | 2,210 | 570 | 20.5% | 2,684 | 2,589 | 115 | 4.3% |
| 1967 | 3,808 | 2,895 | 940 | 24.6% | 4,097 | 3,915 | 189 | 4.6% |
| 1968 | 3,798 | 2,734 | 1,064 | 28.0% | 5,861 | 5,472 | 389 | 6.6% |

Plaintiff's accounting, substantially adopted by the Trial Judge, paints a far different picture:

| | Renegotiable (000 omitted) | | | | Nonrenegotiable (000 omitted) | | | |
|---|---|---|---|---|---|---|---|---|
| | *Sales* | *Costs* | *Profits* | *Profit* | *Sales* | *Costs* | *Profits* | *Profit* |
| 1966 | 4,956 | 4,622 | 334 | 6.7% | 2,683 | 2,374 | 306 | 11.4% |
| 1967 | 7,117 | 6,446 | 671 | 9.4% | 4,097 | 3,641 | 671 | 16.3% |
| 1968 | 7,020 | 6,293 | 727 | 10.3% | 5,861 | 5,136 | 725 | 12.3% |

8. In response to a question concerning the accuracy of figures *put forward in plaintiff's new* accounting for FY 1968, Camel's comptroller, hired only a few months before the trial, testified that he was still (at the time of trial) "in the process of trying to prove those figures."

9. Camel could produce almost no documentation for FY 1968 and all of its figures for that year were "derivations" from the general ledger. Defendant's figures for FY 1968 were based on Camel's sworn RB–1 form, which had apparently been prepared and submitted to the Board prior to the loss of the records.

10. The Trial Judge's overall approach is perhaps best characterized by his statements concerning a relatively minor dispute involving the actual amount of FY 1966 renegotiable sales. In accepting as accurate the plaintiff's figure, he reasoned that defendant's auditor had only:

. . . testified in general terms that the lower figure was the one *he found upon examination of plaintiff's books* . . . he neither offered a more detailed explanation of the source . . . nor corroborated his opinion by production of photocopies nor by reference to specific ledger or journal entries . . . . Since, in contrast to a tax case, no presumption runs in favor of the correctness of accounting figures offered by defendant, the evidence on this minor issue stands, even at best, in equipoise . . . . Plaintiff fulfilled its duty under *Lykes Bros.* when it brought forward its [pre-trial] accounting statements . . . . *Defendant has failed to carry its basic and essential burden of proof by not making its objection to plaintiff's figure more specific, and by not demonstrating by a preponderance of the evidence at trial, the factual basis for the . . . variance it suggests.* (emphasis added).

The difference is clear, and virtually decisive, with renegotiable percentage profits being reduced from 20.5%, 24.6%, and 28.0% (respectively for each of the review years) to 6.7%, 9.4%, and 10.3%.[11]

The defendant took strong exception to the accounting determinations of the Trial Judge. Defendant's arguments essentially center on the contention that the Trial Judge improperly reversed the *Lykes Bros.* burden of proof by allowing the plaintiff to make only unsubstantiated assertions and then requiring defendant to prove them wrong.

The crux of the Government's contention can be found in the following statement:

If the Trial Judge's findings of fact on accounting (which are also implicity [sic] erroneous conclusions of law), were to be adopted by this Court, it would put the Renegotiation Board in the impossible position of having to accept any contractor's accounting allegations as correct and then undertaking to either verify or disapprove [sic] them in order to survive an appeal in this Court. This would be administratively impossible and abviously [sic] contrary to the expressed intent of the statute. The Board, like the Internal Revenue Service, must place the burden on the taxpayer to back up all of its claimed costs with solid evidence. This Court's evidentiary rules on review must continue to respect these administrative realities.

The Government proceeds to argue that the plaintiff's cost allocations, which had been accepted by the Trial Judge, were totally unsupported by the record and were based upon artificial allocations rather than upon actual costs as shown on plaintiff's books. No witness having any part in the preparation of the pre-trial statements was brought forward to support them, the only testimony being by the current comptroller who had not participated in their preparation and could offer no explanation of the

various apparent discrepancies and by Camel's president, who was admittedly not knowledgeable concerning accounting details.

Camel's response to defendant's overall arguments on total dollar profits and accounting was confined to supporting the findings of the Trial Judge by citing entries in the record demonstrating that plaintiff had met its burden of *pleading* new accounting data.

B. *Profits as a Percentage of Sales:* In determining the percentage profits earned by plaintiff during the review years, the Trial Judge reasoned that the value of GFP "must be taken into the net renegotiable sales figure in computing profit as a percentage of sale" primarily because the "GFP Bailment System" placed the bailee (plaintiff) in "virtually the same position as a materials purchaser as to benefits derived and burdens assumed from its receipt of the GFP." This inclusion of GFP in the total sales and total cost figures resulted in a proportionate reduction in the percentage profit figure which must be compared to determine excessiveness.

The Government argues that the inclusion of the value of GFP violates both a Board regulation [12] and a holding of this court,[13] and asserts that the plaintiff's position vis-a-vis a purchaser of raw materials was vastly superior. The plaintiff, according to the Government, was much better situated than the normal purchaser because it did not have to search out sources of material and because it did not have to worry about normal financing problems or possible cost increases related to materials used in production.

Plaintiff counters that the additional burdens incurred by a GFP recipient more than offset any small benefit which might accrue. Plaintiff notes that the Trial Judge found detriments to the plaintiff in such arrangements as plaintiff's contractual inability to shop around for lower price goods,

---

11. The commercial profit has been correspondingly increased from 4.3%, 4.6% and 6.6% to 11.4%, 16.3% and 12.3%. This increase in commercial profits assumes significance when the renegotiable profits are compared with the commercial profits.

12. 32 C.F.R. § 1499.1–24 (1976).

13. *Citing Major Coat Co., Inc. v. United States,* 543 F.2d 97, 211 Ct.Cl. 1 (1976).

plaintiff's contractual obligation to accept from the Government up to 10% "short" pieces (which increased plaintiff's costs of production), and plaintiff's contractual responsibility to account for and to store separately the GFP. Plaintiff, in summary, contends that the Trial Judge was correct in finding that plaintiff stood in "virtually the same position as the purchaser of raw materials."

## II. ARE PROFITS EXCESSIVE?

A. *Appropriate Standards of Comparison:* The Trial Judge assessed the numerous standards of comparison asserted by the parties and determined that comparisons between plaintiff's commercial and renegotiable business and between plaintiff and four of its major competitors would be the most useful standards for determining excessiveness. He rejected, out of hand, defendant's asserted base years comparison, finding that the differences between the review years and the base years were too great to allow useful comparison.

Defendant argues that the Trial Judge's use of the commercial and competitors standards was in error because both of these standards utilized review year data and the existence of a wartime economy and a general "camping craze" during these years tended to inflate *all* profits. The Government further contended that its use of a base years comparison presented the only proper analysis, since the base years data depicted the profits which would exist absent a war emergency.

Finally, the Government asserts that the dissimilarities between plaintiff and its competitors and between plaintiff's commercial and renegotiable sales were so great as to preclude effective comparisons, while the differences between plaintiff's base years' and review years' renegotiable operations, if any existed, were minimal.

Plaintiff's rejoinder is exactly the opposite of defendant's argument; it cites the Trial Judge's findings of competition in the commercial market and military tent market as supporting the utility of the commercial and competitors comparisons.

B. *Statutory Factors:* The Trial Judge found that the Government had relied on the single statutory factor of net worth to an inordinate extent and then rejected defendant's proof even under that statutory factor because he rejected defendant's base years standard of comparison. He determined that plaintiff had made a *prima facie* case and, therefore, had demonstrated entitlement to some credit under each of the statutory factors.

Yet defendant argued that it had, in fact, properly analyzed and applied the statutory factors with respect to Camel and that it had carried its burden of proof under the statutory factors of efficiency, reasonableness of costs and profits, net worth, extent of risk assumed, and contribution to the defense effort.

Plaintiff not only agrees with the Trial Judge but further counters that any such assertion on the part of defendant is "preposterous" since the Government failed to present any competent evidence whatsoever as to any statutory factor other than net worth.

On these difficult and complex questions of law and fact presented to the court, we hold that, with the exception of the exclusion of GFP, the defendant is correct in its statement of the law concerning the accounting portion of this case and that, again with the exception of GFP, the Government's figures represent a correct accounting from which our excessive profits analysis may begin. We also hold, however, that plaintiff is entitled to favorable recognition and credit under several of the statutory factors as outlined in detail below.

At this point, having presented an introduction to the history of the case, the Trial Judge's holdings, a brief explanation of the problems involved and what each party argues, we now move forward to our analysis on review, to our summary and computations and to our final holding.

## I. ACCOUNTING DETERMINATIONS

As previously stated, any determination of excessive profits must begin with an accurate accounting—an accurate state-

ment of the dollar and percentage profits realized by the renegotiated contractor in each of the years under review.

### A. Total Dollar Profits:

█ It is well recognized in this court that the final burden of proving excessive profits (and the coincident risk of nonpersuasion) is on the defendant. This does not, however, remove all burdens from the plaintiff, who still bears the responsibility for proving any disputed financial data. Plaintiff's burden was aptly set forth in Lykes Bros.[14] The words will bear reemphasis:

. . . In the course of pretrial proceedings, which may include an audit of plaintiff's books by defendant, the parties will likely stipulate the accuracy of much of the financial data submitted by plaintiff. However, if there is a dispute about such data, plaintiff has the burden of going forward with evidence proving the accuracy of the financial data, including the segregation of the accounting on renegotiable business from nonrenegotiable business and the propriety of plaintiff's cost allocations under accepted accounting principles. (emphasis added). 459 F.2d at 1401, 198 Ct.Cl. at 326.

The rationale for such a requirement is clear. The plaintiff is in a much better position to prove financial facts concerning its own operations. While the defendant may have (and probably will have) the results of an audit on which to rely, the plaintiff has in its possession and control all essential documents and very probably employs any individuals who could in any way testify with regard to the veracity of various financial data concerning the renegotiated contractor's operations. This makes it much easier for plaintiff to prove the accu-

racy or inaccuracy of any disputed accounting information.

An interpretation which places both the burden of proof and the risk of non-persuasion for accounting data on the plaintiff is also in keeping with the decision of this court in Aero Spacelines, Inc. v. United States, 530 F.2d 324, 208 Ct.Cl. 704 (1976) [hereinafter cited as Aero Spacelines], where this court held:

Plaintiff employed an established cost accounting method for 1966. Accordingly, in order to persuade the court to use its statutory authority to modify plaintiff's chosen method of accounting, plaintiff must demonstrate that the method actually used does not properly reflect plaintiff's costs. [footnote omitted] 530 F.2d at 335, 208 Ct.Cl. at 720. See also, 50 U.S.C. App. § 1213(f)(1970).

█ Indeed, the situation which faced the court in Aero Spacelines is somewhat analogous to the case which confronts us now—a plaintiff seeking redetermination of excessive profits arrived at the trial with a set of accounting figures which were in disagreement with the figures which the plaintiff, itself, had earlier prepared (and, in the present case, submitted to the Board).[15] The clear mandate of both Lykes Bros. and Aero Spacelines [16] for the case at hand is that the plaintiff must carry the risk of non-persuasion as it attempts to establish its amended figures for each of the review years. In this respect, it was obvious error for the Trial Judge to place that risk on defendant.

The effect of the Trial Judge's misplacing this burden was devastating to the Government, whose entire case was based on the results of an audit which (at least for FYs 1966 and 1967 where plaintiff's original records were available) was conducted on plaintiff's actual, original records and on

---

14. See p. 284, supra.

15. See also, Bay Co. v. Renegotiation Board, 38 T.C. 535 (1962), where the Tax Court held that a contractor was not permitted under section 103(f)(50 U.S.C. App. § 1213(f) to change figures developed by a regularly employed cost

accounting method unless it demonstrated that such a method was inaccurate.

16. The burden on plaintiff to prove the accuracy of his financial data was also recognized in A. C. Ball Co. v. United States, 531 F.2d 993, 1004, 209 Ct.Cl. 223, 243–44 (1976).

the sworn RB–1 submission which plaintiff had made to the Board. To allow plaintiff to enter into evidence new data, based solely on the highly generalized testimony of two of plaintiff's officers (who admitted they had neither assisted in the preparation of the earlier documents nor even completely surveyed the original materials), and then to require the defendant to *disprove* this new data based on the old audit figures, clearly places an inequitable burden on the defendant.

In the case at hand, the accounting results of this misplaced burden were multiple. Monetarily, other than the GFP issue which we shall discuss separately, the largest factor involved the plaintiff's reallocation of costs, which the Government characterized as an attempt to load "huge amounts of costs from the commercial business into the renegotiable business."

The relevant figures, as shown by defendant's audit, were as follows:

### FY 1966

| | Total Business | Renegotiable Business | Commercial Business |
|---|---|---|---|
| Net Sales | $5,465,453.63 | $2,780,606.39 | $2,684,847.24 |
| Cost of Goods Sold | 4,116,760.40 | 1,947,126.62 | 2,169,633.78 |
| Selling/Adv. Expense | 307,554.97 | 48,107.53 | 259,447.44 |
| G&A Expenses | 376,209.71 | 215,236.92 | 160,972.79 |
| Net Operating Profit | 664,928.55 | 570,135.32 | 94,793.23 |
| % Profit (of total sales) | 12.17% | 10.43% | 1.74% |
| % Profit (of Renegot. sales) | | 20.50% | |
| % Profit (of Comm. sales) | | | 4.3% [17] |

### FY 1967

| | Total Business | Renegotiable Business | Commercial Business |
|---|---|---|---|
| Net Sales | $7,905,020.12 | $3,808,248.02 | $4,096,772.10 |
| Cost of Goods Sold | 5,706,559.26 | 2,433,550.68 | 3,273,008.58 |
| Selling/Adv. Expense | 557,299.71 | 155,601.71 | 401,698.00 |
| G&A Expenses | 534,801.79 | 294,670.03 | 240,131.76 |
| Other Income | 22,717.72 | 15,307.88 | 7,409.84 |
| Net Operating Profit | 1,129,077.08 | 939,733.48 | 189,343.60 |
| % Profit (of total sales) | 14.28% | 11.89% | 2.39% |
| % Profit (of Renegot. sales) | | 24.68% | |
| % Profit (of Comm. sales) | | | 4.62% |

17. This figure was originally shown as 3.5%, but was subsequently "adjusted" upward to 4.3% by defendant.

*FY 1968* [18]

| | Total Business | Renegotiable Business | Commercial Business |
|---|---|---|---|
| Net Sales | $9,659,000.00 | $3,798,000.00 | $5,861,000.00 |
| Costs & Expenses | 8,206,000.00 | 2,734,000.00 | 5,472,000.00 |
| Net Operating Profit | 1,453,000.00 | 1,064,000.00 | 389,000.00 |
| % Profit (of total sales) | 15.04% | 11.01% | 4.02% |
| % Profit (of Renegot. sales) | | 28.01% | |
| % Profit (of Comm. sales) | | | 6.6% |

These figures were entered into the record through the testimony of defendant's witness, Frank Morris, an FBI special agent accountant, who had inspected the records of the company in both 1973 and 1974 [19] in specific effort to develop profit and loss statements for the review years. His testimony at trial demonstrated both the diligence of his efforts to unravel the confusing track of the corporate enterprise and the inexact nature of the accounting science. He did, however, make an effort to relate all of his findings back to the records as they were kept by plaintiff, and to allocate or estimate only where gaps in the documentation or apparent discrepancies made it absolutely necessary.

Plaintiff's figures were not based on actual cost accounts. They were new, special allocations, having been created once the "inaccuracy" of the original records had been "established" by the testimony of Messrs. Bone and Laxer.[20] The sum total of their testimony was to the effect that, although their accounting system showed costs by location of the plant, "some" renegotiable work was performed at plants classified commercial and "some" commercial work was performed at plants classified as renegotiable. Neither man could testify, nor were records produced, concerning the exact amount of costs which were "misplaced" as a result of the alleged inability of the established accounting system properly to reflect costs. Camel's theory of its *Lykes Bros.* burden, apparently accepted by the Trial Judge, seems to be that once it has alleged that some "inaccuracy," regardless

18. Since plaintiff's original records for FY 1968 were not made available to defendant, a complete audit was impossible. Defendant's figures were, therefore, derived from plaintiff's sworn RB-1 filings. Plaintiff, parenthetically, made no effort to explain the absence of the original records.

Plaintiff's original RB-1 filing for FY 1968 showed $1,064,000 in net operating profit for its renegotiable business. The Board "adjusted" that figure downward to $1,024,000, and the Government asserts only this lesser amount. Since this court has no record detailing the basis for the Board's adjustment, and since no testimony was adduced at trial concerning this fact, we determine the figure in plaintiff's sworn RB-1 to be most reliable for purposes of our *de novo* review.

19. His 1973 audit was conducted with the assistance of a Mr. Bruce Martin, who was, at that time, Camel's comptroller. His 1974 visit

occurred after Mr. Bone had replaced Mr. Martin. Mr. Bob Allen, Camel's comptroller during the review years was not available for any audit procedures, and was not called as a witness by Camel during the trial to substantiate its review years claims. Mr. Hammers, Camel's comptroller when the allocations were made, was not called as a witness and was not deposed.

20. Mr. Laxer testified that Camel's comptroller at the time of the renegotiation of FYs 1966 and 1967, Mr. Hammers, was "miffed" when he attended a Board session in Washington and discovered that the Board's figures were based exactly on the initially submitted RB-1s. Mr. Laxer further testified that, after he and Mr. Hammers "discussed [the situation] on the way home," Mr. Hammers "reworked the RB-1s making the allocations exactly as Mr. Hammers thought . . . ." Mr. Hammers was not produced to testify.

of magnitude, exists in the figures arrived at through its standard accounting procedures, it may scrap *all* of those figures and calculate totally new figures, based on some allocative ratio of its personal choice, which it then became defendant's burden to disprove.

■■■■ This is directly opposed, as we have previously discussed, to both the letter and spirit of *Lykes Bros.* and *Aero Spacelines.* It is plaintiff's burden to go "forward with evidence proving the accuracy of the financial data" . . . "and the propriety of plaintiff's cost allocations under accepted accounting principles." This is particularly true where, as here, the figures it disputes are based on its own established accounting system and procedures. The risk of nonpersuasion must also remain on the plaintiff. This distribution of the burden and risk is, indeed, as defendant argues, in keeping with "administrative realities." Neither the Board nor the Act under which it operates could continue to function if this procedure were reversed. The Board, and this court, *must* place the burden on the renegotiated contractor to back up all of its claimed costs with solid evidence. We hold that plaintiff has not sufficiently done so. In this case, Camel has failed to carry its burden.[21]

The failure of proof by the plaintiff extends to all of the accounting data contested by the Government, and the figures put forward by the defendant, as detailed *supra,* are hereby found, with the exception of GFP, to represent an accurate accounting from which all statutory comparisons must begin.[22]

## B. *Profits as a Percentage of Sales:*

Prior to converting the dollar profits into percentages, however, one significant modification must be made to those figures put forward by the Government. The figures which represent total sales and cost of goods sold must be adjusted upward to reflect the inclusion of GFP. Not only did plaintiff make a far more convincing proof for its position of including GFP, but the standard for inclusion of GFP has been significantly modified by developing case law since general standards were enunciated in *Lykes Bros.*

In *Major Coat,* Judge Bennett undertook a thorough, exhaustive and well-reasoned analysis of the GFP problem. Since the *Major Coat* opinion was authored after the Board's determinations in these consolidated cases, the Board clearly did not have the advantage of the *Major Coat* analysis when it decided to exclude GFP. However, based on *Major Coat,* we find that Trial Judge Spector correctly analyzed the problem and correctly included GFP in the sales and cost of material figures.

In resolving a question of whether inclusion of GFP would be proper, *Major Coat* outlined as the court's task:

. . . we must determine whether a GFP 'bailee' bore virtually the same burdens and derived the same benefits in the handling of the GFP as would a purchaser of raw materials. A negligible difference between the two requires that the GFP be accounted for in the same manner as materials purchased. 543 F.2d at 106, 211 Ct.Cl. at 16.

---

21. Because we hold that plaintiff has not carried its burden in any accounting respect, we need not discuss the relative merits of positions taken on such sub-areas as indirect manufacturing, advertising, selling or G&A expense.

22. With regard specifically to FY 1968, for which plaintiff could produce virtually none of its original records, defendant has asserted that it is entitled to a default judgment for the amount of profits determined excessive by the Board. While we cannot see how plaintiff could hope to carry its burden of proof in the accounting area without maintaining its original documents and records to back up its position, this court's acceptance of defendant's accounting figures does not relieve defendant of its significant burden of proving that plaintiff realized excessive profits. Therefore, while plaintiff's lack of records may constitute a "default" in the accounting area, it in no way entitles defendant to a default judgment for the amount of excessive profits it claims. Plaintiff has pled, argued and offered proof of benefits deserved under statutory factors; to be entitled to judgment, defendant must still overcome these arguments.

We believe this to be a clear and sound statement of the problem before us now.

The Government cites 32 C.F.R. § 1499.1–24 (Renegotiation Ruling No. 24) (1976) in support of its contention that GFP must be excluded in our current analysis. That section states, in part:

> . . . Since the contractor does not purchase, and at no time owns, the Government-furnished materials, his return of the finished product does not constitute a sale of such materials. Therefore, the value of the furnished materials may not be included in renegotiable sales or costs. 32 C.F.R. § 1499.1–24(d) (1976).

The Government then argues that this "administrative interpretation" if reasonable, *must* be followed by the court. The fallacies of this assertion are numerous.

▮ As plaintiff notes, the cited section constitutes only a ruling and is thus not due the same deference as a properly-issued regulation. In addition, this ruling was issued, in 1969, *after* the FYs under review here. Application of the ruling to exclude GFP in fiscal years prior to its issuance would yield inequitable results and would be, at best, a questionable practice. Finally, and most importantly, the Act itself states in clear and distinct terms that:

> . . . A proceeding before the Court of Claims to finally determine the amount, if any, of excessive profits shall not be treated as a proceeding to review the determination of the Board, but shall be treated as a proceeding de novo. 50 U.S.C. App. § 1218 (Supp. V. 1975).

This language indicates that the Court of Claims is not bound in any way by the final determinations of the Board, but is free to review *all* of the evidence and arrive at its own determinations.[23]

Our court has previously held to this effect. In *Gibraltar Mfg. Co. v. United States,* 546 F.2d 386, 212 Ct.Cl. 226 (1976) [hereinafter cited as *Gibraltar*], we stated that:

> . . . We think that in executing our responsibilities under 50 U.S.C. App. § 1218, . . . we may not accord the Board decision a presumption of correctness, or treat it as evidence in support of its conclusion. . . . 546 F.2d at 388, 212 Ct.Cl. at 229–30.

If this court, then, is not bound by a final determination of the Board, why should it be restricted to following, as the Government argues, a rule of procedure which the Board applies in reaching its determinations? There is no convincing reason. Indeed, if we were to accept the Government's assertion as correct, the Board could, conceivably, issue a sufficient number of "rulings" so that its procedures in accounting became so structured as to make the process almost a ministerial function—and this court would be bound by those procedures. We cannot, and will not, accept such reasoning.

▮ The only way in which the purposes of the Act in this regard can properly be achieved is for this court to accord the renegotiated contractor a totally fresh hearing which, from the start, is free from the strictures of Board procedures and any presumption of correctness in the Board's determinations.

This is not to say that we may not benefit from the Board's expertise. Indeed, "we may [often] take a sideways glance at [a Board decision] as a mere suggestion." *Gibraltar,* 546 F.2d at 388, 212 Ct.Cl. at 230. However, after taking our "sideways glance" at the Board ruling here at issue, we believe the rationale of the *Major Coat* analysis to be far superior in fairly determining the GFP issue. If there be, in fact, a "negligible difference" between a recipient of GFP and a regular purchaser of raw materials, then fairness "requires that the GFP be accounted for in the same manner

---

**23.** This specific intent of Congress to remove Renegotiation redetermination proceedings from the normal ambit of judicial review of administrative determinations and proceedings vitiates the "reasonable interpretation" argument put forward by defendant and thereby distinguishes *Port Authority of St. Paul v. United States,* 432 F.2d 455, 193 Ct.Cl. 108 (1970), cited by the Government.

as materials purchased." *Major Coat,* 543 F.2d at 106, 211 Ct.Cl. at 16.

 The *Major Coat* opinion analyzed the GFP bailment system at some length and detailed some important touchstones which could be utilized in determining whether more than a "negligible difference" existed between the GFP bailee and the raw materials purchaser. The court there distinguished the GFP bailment system from the earlier "free issue system" (although it noted that under both systems the contractor was "relieved" of both the problem of source location and any difficulties encountered in normal financing), pointing out that, under the GFP bailment system, the entire risk of end-item yield was placed squarely on the contractor.

After carefully balancing the benefits of the GFP bailment system to the contractor against the numerous component risks subsumed in this end-item yield risk, the *Major Coat* court stated:

> On balance, we conclude that, on the facts of this case, the value of the GFP should be taken into the net renegotiable sales figure and included in calculations of renegotiable profit as a percentage of sales, to place plaintiff on a parity with a manufacturer that purchases all the materials it uses. 543 F.2d at 108, 211 Ct.Cl. at 20.

The court also cautioned, however, that it was not enunciating a universal rule of GFP inclusion, that the balancing must be done on the facts of each particular case, and that the GFP-included percentage profit figure could not be compared to other, GFP-excluded percentage profit figures with any expectation of helpful or equitable results.[24]

Applying the *Major Coat* balancing test to the case at hand, we find that the Trial Judge had on the record more than a sufficient number of facts from which he could properly conclude that Camel, as a GFP bailment system bailee, was in "virtually the same position as a materials purchaser as to benefits derived and burdens assumed from its receipt of the GFP." Indeed, the Trial Judge could, and did, find on the basis of the record developed by plaintiff that the plaintiff, as a GFP bailee, assumed obligations, in addition to those of a materials purchaser, which served to offset the benefits argued by the defendant.[25]

We hold that the appropriate value of GFP [26] provided to Camel must be included in its review year figures for purposes of renegotiation. Such inclusion would have the following results on the Government audit figures already approved, with the exception of the GFP issue, as correct statements of plaintiff's review years accounting.[27]

---

**24.** This last caution will assume significance *infra,* when GFP *must* be excluded for comparison with competitors' profit figures, which were obtainable only through the Board and, thus, only on a GFP-excluded basis.

**25.** The end-item risks assumed by the plaintiff, and developed on the record, appeared to be many of the same ones discussed in *Major Coat.* These included the risk of underestimating the amount of GFP needed and the entire risk of loss from the time of picking up raw materials to delivering finished goods. In addition, however, the record in *Camel* showed that plaintiff assumed obligations to store and account for GFP separately (from regular inventory), to pay for all transportation expenses, to accept 10% short pieces without additional cost allowances, to accept Govern-

ment-caused delays in delivery without compensation, and to refrain from contracting with any commercial supplier for the same goods at lower prices.

**26.** The appropriate GFP values, stated at p. 3, *supra,* are:

| | |
|---|---|
| FY 1966 | $ 2,173,601 |
| FY 1967 | 3,309,197 |
| FY 1968 | 3,221,823 |

**27.** For a discussion and illustration of the proper figures, as put forward by the Government, *see supra* at p. 296. Figures changed as a result of inclusion of GFP are marked *.

### FY 1966

| | Total Business | Renegotiable Business | Commercial Business |
|---|---|---|---|
| Net Sales | $7,639,054.63 * | $4,954,207.39 * | $2,684,847.24 |
| Cost of Goods Sold | 6,291,361.40 * | 4,120,727.39 * | 2,169,633.78 |
| Selling/Adv. Expense | 307,554.97 | 48,107.53 | 259,447.44 |
| G&A Expenses | 376,209.71 | 215,236.92 | 160,972.79 |
| Net Operating Profit | 664,928.55 | 570,135.32 | 94,793.23 |
| % Profit (of total sales) | 8.7% * | 7.46% * | 1.2% * |
| % Profit (of Renegot. sales) | | 11.51% * | |
| % Profit (of Comm. sales) | | | 4.3% * |

### FY 1967

| | Total Business | Renegotiable Business | Commercial Business |
|---|---|---|---|
| Net Sales | $11,214,217.12 * | $7,117,445.02 * | $4,096,772.10 |
| Cost of Goods Sold | 9,015,756.26 * | 5,724,747.68 * | 3,273,008.58 |
| Selling/Adv. Expense | 557,299.71 | 155,601.71 | 401,698.00 |
| G&A Expenses | 534,801.79 | 294,670.03 | 240,131.76 |
| Other Income | 22,717.72 | 15,307.88 | 7,409.84 |
| Net Operating Profit | 1,129,077.08 | 939,733.48 | 189,343.60 |
| % Profit (of total sales) | 10.06% * | 8.37% * | 1.69% * |
| % Profit (of Renegot. sales) | | 13.20% * | |
| % Profit (of Comm. sales) | | | 4.62% * |

### FY 1968

| | Total Business | Renegotiable Business | Commercial Business |
|---|---|---|---|
| Net Sales | $12,880,823.00 * | $7,019,823.00 * | $5,861,000.00 |
| Cost of Goods Sold | 11,427,823.00 * | 5,955,823.00 * | 5,472,000.00 |
| Net Operating Profit | 1,453,000.00 | 1,064,000.00 | 389,000.00 |
| % Profit (of total sales) | 11.2% * | 8.20% * | 3.00% * |
| % Profit (of Renegot. sales) | | 15.16% * | |
| % Profit (of Comm. sales) | | | 6.6% * |

As can be seen by a comparison of the GFP-inclusive and the GFP-exclusive tables, the most significant effect of the inclusion of GFP is the reduction of percentage profits (from renegotiable business) from 20.50%, 24.68%, and 28.01%, respectively, for the three review years, to 11.51%, 13.20% and 15.16%, respectively. We further hold, as a matter of fact and of law, that these are the appropriate figures, as developed in the immediately preceding tables, for use in the Standards of Comparison and Statutory Factor analyses which follow.

In summarizing the accounting portion of this opinion (Part I), weighing all the evidence, we hold that defendant has overcome the Rule 147(b) presumption of correctness attaching to Judge Spector's opinion and fact finding, insofar as the Trial Judge misconstrued the *Lykes Bros.—Aero Spacelines* burden of proof requirements and incorrectly accepted as persuasive plaintiff's accounting data. However, we further hold that Judge Spector was correct in denying defendant a default judgment for FY 1968 and was correct in his inclusion of the value of GFP in figuring percentage profit.

## II. ARE PROFITS EXCESSIVE?

■ With the proper accounting figures thus determined, it is now possible to move on to compare this data, as directed by the statutory factors, against other available data to determine whether the profits realized by Camel were excessive. In this next phase, the determination of excessiveness, the burden of proof shifts to the defendant, who must convince us of both the fact and amount of excessive profits.

A. *Appropriate Standards of Comparison :*

Another vigorously contested aspect of this case involves the proper comparisons to be made in determining what portion, if any, of a company's renegotiable profits were excessive. As previously discussed,

the Government asserts that, according to the prior opinions of this court,[28] a "normal years" or "base years" method of analysis constitutes the proper comparison. Plaintiff adopted a more scattershot approach, introducing evidence derived from its own commercial business, its whole group of military tentage competitors, and an Internal Revenue Service grouping of 150 loosely related fabric and textile manufacturers. The Trial Judge assessed this veritable plethora of options and arrived at the conclusion that Camel had realized no excessive profits in any of the review years.

The confusion and disagreement here, as well as the wide range of theories put forth, indicate the need for some further guidelines in this comparative area of renegotiation law. Initially, we should state that we forego the opportunity to wander into the intellectual mine field that is the Government's exercise in semantics concerning whether the Act is primarily aimed at prices or profits. It serves no useful purpose. In fact, in many respects, prices and profits represent two sides of the same coin. For our purposes, the goals of the Act were more than adequately set forth in *Major Coat* :

. . . Renegotiation merely seeks to reconstruct the competitive price to the Government, and the *competitive profit for the contractor*, that negotiation would have produced absent the suddenness of wartime demand on the marketplace. 543 F.2d at 110, 211 Ct.Cl. at 24. (emphasis added)

■ Thus, in order properly to determine what profits of the renegotiated contractor, if any, were excessive and the result of the "suddenness of the wartime demand on the marketplace," this court must attempt to *"reconstruct"* some sort of normality from what is essentially an abnormal environment, the wartime marketplace.[29] The basically theoretical nature of such an attempt at reconstruction often necessitates a "broad brush" approach to the entire mat-

---

**28.** *See, e. g., Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 505, 211 Ct.Cl. 110, 121 (1976).

**29.** *See Mills Mfg. Corp. v. United States*, Nos. 607–71, 655–71, and 697–71, 571 F.2d 1162 (Ct. Cl., 1978).

ter, *see, e. g., Gibraltar*, 546 F.2d at 388, 212 Ct.Cl. at 229; *A. C. Ball Co. v. United States*, 531 F.2d at 996, 209 Ct.Cl. at 229, with the ultimate goal being a fair and equitable adjustment which allows a contractor to retain what he has rightfully earned, but requires him to disgorge any sums which have accrued to him through what might properly be termed "profiteering."

In undertaking this effort, the court has been directed by statute to consider certain factors. It is what the statute does not say, however, which causes the difficulty; it does not say how, or against what background, we are to "consider" these factors. Since no absolute standards are dictated (which would be virtually impossible to formulate), it seems clear that renegotiation must be a "comparative process." *See, e. g., Major Coat*, 543 F.2d at 102, 211 Ct.Cl. at 9. The goal of this comparative process is to answer a very "important question in renegotiation [which] is ' . . . where the contractor in a defense industry belongs in the hierarchy of profit returns of industry as a whole and the reason for his being placed in that particular position.'" *Aero Spacelines*, 530 F.2d at 340, 208 Ct.Cl. at 730. (citation omitted)

In our previous renegotiation cases, we have formulated a sort of seriatim approach to the consideration of each of the statutory factors. *See, e. g. Major Coat*, 543 F.2d 97, 211 Ct.Cl. 1 (1976); *Butkin*, 544 F.2d 499, 211 Ct.Cl. 110 (1976); *Mason & Hanger-Silas Mason Co., Inc. v. United States*, 518 F.2d 1341, 207 Ct.Cl. 106 (1975). While this approach has enabled us to maintain the flexibility so vital to achieving the purposes of the Act, *see Mason & Hanger*, 518 F.2d at 1346–48, 207 Ct.Cl. at 115–18 (*citing Lichter v. United States*, 334 U.S. 742, 773 and n. 18, 68 S.Ct. 1294, 92 L.Ed. 1694), it has also, apparently, encouraged a scattershot approach by plaintiffs and the Government alike.

In these cases, we have compared renegotiated contractors to themselves (a "base years" or "normal years" approach), *see, e. g. Gibraltar*, 546 F.2d at 391, 212 Ct.Cl. at 235, to other contractors with varying degrees of similarity to the renegotiated contractor, *see, e. g. Major Coat*, 543 F.2d at 120, 211 Ct.Cl. at 41, and to both themselves *and* other contractors, *see, e. g. Mason & Hanger*, 518 F.2d at 1365, 207 Ct.Cl. at 146–47. Of these various approaches, the dual comparison appears most appropriate; in fact, if our purpose is actually to "reconstruct" normality, the greater the number of *useful* comparisons we can make, the closer we can come to estimating what a normal business environment might be. We have often, however, been limited to one comparison or another by the absence or lack of utility of evidence from which to draw any others.

We have also previously recognized that the relative utility of a given comparison is based on the similarities which can be established between the renegotiated contractor and the standard to which we attempt to compare it. *See, e. g., Major Coat*, 543 F.2d at 120, 211 Ct.Cl. at 42. The perhaps inevitable result of our looking at various unrelated standards and attempting to assess the relative utility of each is apparent in the case at hand; the renegotiated contractor and the Government each selects a standard on which to rely and argues the statutory factors in relation to that standard. As a consequence, they almost totally "miss each other" in their attempted proofs; neither adequately answers the other. The result is an incomplete patchwork of asserted economic data from which we must pick and choose in our attempt to reconstruct normality.[30]

In this case, the proceedings before the Trial Judge represented nearly a classic example of the parties' arguing past each other. The plaintiff, as was its burden under *Lykes Bros.*, went forward by pleading the statutory factors upon which it re-

---

**30.** This court has previously noted its frustrations with the patchwork nature of the evidence before it. *See, e. g., Gibraltar*, 546 F.2d at 394, 212 Ct.Cl. at 240; *Major Coat*, 543 F.2d at 124, 211 Ct.Cl. at 48; *Aero Spacelines*, 530 F.2d at 340, 208 Ct.Cl. at 730.

lied for favorable consideration. However, it chose as standards of comparison its own commercial business and the businesses of other military tent producers and other textile manufacturers. Defendant responded by relying primarily upon the statutory factor of net worth and employment of capital, but it chose as its standard of comparison the plaintiff's own business during the base years. The Trial Judge was thus faced with the monumental task of sorting, picking and choosing among numerous diverse facts in an effort to arrive at a fair and equitable conclusion.

■ Our next analytical task, then, would appear to involve an evaluation of the asserted standards of comparison, in order that we may determine which of these standards can effectively be utilized as a "starting point" in our determination of excessiveness.

Plaintiff has asserted a number of possible standards against which we could measure its profits. First, it produced evidence of its profitability in comparison with certain of its competitors in various groupings. (For clarity in further discussion, we will term this "competitor's comparison" Comparison X.) The first grouping suggested by plaintiff is a grouping of primarily military tent manufacturers by their earnings on General Purpose Medium (GPM) tent contracts, which contracts constituted the bulk of their renegotiable work. While we decline to utilize this grouping because we do not have sufficient data to determine how properly to calculate plaintiff's GPM profit, as plaintiff would have us do, we note in passing (and taking our "sideways glance" at Board proceedings) that these contractors with similar volume, whose GPM tent contracts constituted significant portions of their renegotiable work, had their GPM profits renegotiated by the Board to 14.1%[31] in FY 1966 and to between 13.6% and 15.4% in FY 1967. While these figures may be of questionable probative value since we have no record of the Board's deliberations in obtaining them, they may constitute a useful background by indicating what the Board, in exercising its experience and expertise, believed to constitute a "normal" profit in each of those FYs.

Plaintiff's second suggested grouping under Comparison X is more generalized, consisting of all military tent makers earning profits within the review period and reporting to the Board. This grouping consisted of plaintiff's regular competitors, plus ten other firms without such prior experience, who joined the military tent market during the review years. A table of this comparison could be depicted as follows:[32]

*Comparison X*

| *FY 1966* | *Plaintiff* | *Others* | *No. of Others* |
|---|---|---|---|
| Sales range | $2.8 million | $1.4–$2.8 million | (4) |
| Actual profit | 20.50% | 9.2%–34.4% | |
| After Board action | ** | 9.2%–15.4% | |

| *FY 1967* | *Plaintiff* | *Others* | *No. of Others* |
|---|---|---|---|
| Sales range | $3.8 million | $1.1–$6.7 million | (7) |
| Actual profit | 24.68% | 6.9%–39.1% | |
| After Board action | ** | 6.9%–15.4% | |

| *FY 1968* | *Plaintiff* | *Others* | *No. of Others* |
|---|---|---|---|
| Sales range | $3.8 million | $1.1–$5.4 million | (11) |
| Actual profit | 28.01% | 7.6%–50.0% | |
| After Board action | ** | 6.8%–15.6% | |

31. These figures are GFP-exclusive, since no GFP-inclusive figures are available from the Board. This 14.1% was renegotiated down from 34.4%; the other competitor, earning only 9.2% escaped renegotiation in FY 1966.

32. Again, since the Board does not supply figures on a GFP-inclusive basis, the comparison must be made exclusive of GFP.

Plaintiff's third suggested grouping under Comparison X involved companies listed by the IRS in its Corporation Source Books of Statistics of Income under IRS's Standard Enterprise Classification 2398. This grouping consisted of 150 "Miscellaneous Fabricated Textile Producers" (of which Camel was one) with assets between $1 million and $5 million. Unfortunately, the IRS statistics (as presented by plaintiff) show nothing about individual companies' involvement with military tent manufacturing, product mix, sales volume or facilities and operations. More importantly, however, the IRS profit figures are given only as averages and, therefore, are not useful to us since we cannot assume Camel to have been merely an average manufacturer.[33] In any event, tax figures are not the same as book figures.

Thus, the first and third of plaintiff's suggested groupings under Comparison X must be rejected outright. We also note, as did the Trial Judge and the Government, significant difficulties with the second suggested grouping. The review period product mixes for most of the other manufacturers are unknown, as are the nature and similarity of the other manufacturers' plants and operating facilities. Perhaps the most troublesome factor, however, is the one pointed out by the Government. In any comparison with competitors during a year under review, there exists the danger that the competitors' profits, too, will be excessive because of a generally overheated market. The Trial Judge, aware of this problem, noted that the situation here was not as non-competitive as the situation in *Major Coat*, where the Government was forced to resort to "rated orders."[34] The Government cites this language of the Trial Judge concerning "competition" as evidence that he confused antitrust law with renegotiation law.[35] We do not believe this to be the case. Certainly, when one is comparing relative profit figures, the nature of competition in the market in which those profits were obtained will be useful in determining the probative value of those figures and the weight which should be given the comparison in a final determination of "excessiveness." Where there is proof of a total lack of competition, such a comparison may be of virtually no use, *see, e. g., Major Coat*, 543 F.2d at 113, 211 Ct.Cl. at 28; on the other hand, where effective competition is proven, such a comparison may be quite useful in "reconstructing normality."

The case at hand appears to present a sort of middle of the road situation—not as non-competitive as the one in *Major Coat*, and yet certainly not a model of a fully competitive market. We must take this factor into account in weighing Comparison X. Also, in taking yet another "sideways glance" at the Board's determinations, we note that the Board considered up to a 15.6% profit to be "normal."[36]

Despite the problems noted and the cited dissimilarities, we find that plaintiff's Comparison X, when the grouping of all other military tent manufacturers is employed, may be of value to us in determining what constituted "normal" profits during the review years, so long as an appropriate discount in probative weight is allowed for the cited difficulties with this standard.

The plaintiff asserts yet another comparison which it claims will assist us in our task of reconstructing normality, a comparison with plaintiff's own commercial market (Comparison Y). The Trial Judge considered plaintiff's evidence disclosing its own profitability in *commercial* sales to be

33. *See, A. C. Ball*, 531 F.2d at 1015, 209 Ct.Cl. at 263; *see also, Major Coat*, 543 F.2d at 117, 211 Ct.Cl. at 36.

34. A rated order is an emergency procurement device which legally obligates a contractor to accept a Government procurement contract. 50 U.S.C. App. § 2071 (1970). *See also, Major Coat*, 543 F.2d at 103, 211 Ct.Cl. at 11.

35. The Government drew a similar conclusion from the Trial Judge's discussion of a "viable pricing mechanism" in the plaintiff's commercial market.

36. Such a "sideways glance" at profit figures found reasonable by the Board was also taken by the court in *Mills Mfg. Corp. v. United States*, Nos. 607–71, 655–71, and 697–71, 571 F.2d at 1162 (Ct.Cl., 1978).

"highly relevant" for the purpose of establishing an index of reasonable profit in the pertinent commercial sector. He, in turn, considered the commercial market to paint an excellent picture of "normality" because the Government presented no evidence that a "viable pricing mechanism" did not exist in the concurrent commercial market.

As with Comparison X, we note the difficulties in comparing the plaintiff's renegotiable business with its commercial business. For example, the Government has pointed out the dissimilarities between the products which plaintiff produced for the commercial market and the products which it produced for the Government. The Trial Judge has noted, however, his reasons for considering Camel's commercial business to be a useful comparison and we find his conclusions on this matter persuasive.[37] Since it appears that there was greater competition in the commercial market than there was in the military tent market and since we find the similarity between Camel's commercial and renegotiable business to be at least as great as the similarity among the "all military tentmakers" group, we conclude that plaintiff's Comparison Y is entitled to relatively greater weight as a "starting point" than is Comparison X.

The Comparison Y standard may be depicted in the following fashion:[38]

*Comparison Y*

| FY | Renegotiable Sales (000) | Profits | Commercial Sales (000) | Profits |
|----|----|----|----|----|
| 1966 | 4,954 | 11.51% | 2,684 | 4.3% |
| 1967 | 7,117 | 13.20% | 4,097 | 4.6% |
| 1968 | 7,019 | 15.15% | 5,861 | 6.6% |

Ironically, because of the accounting adjustments made in Part I *supra*, neither one of the standards asserted by the plaintiff paints a picture entirely favorable to the plaintiff. About the only thing that can be said is that plaintiff's review year profits were not as high as some of its competitors in the military tent market. On the other hand, all those competitors with higher profits had them renegotiated downward by the Board, so Camel cannot be heard to complain that it was singled out for special treatment.

The defendant contends that the only appropriate comparison must involve as a "starting point" the plaintiff's renegotiable business before the Vietnamese War caused a heat-up in the market. The Trial Judge rejected this so-called "base years" comparison (Comparison Z) out of hand, citing as a reason the many differences which he drew from the evidence presented between the plaintiff's base years' renegotiable operation and its review years' renegotiable operation. This summary rejection was an incorrect approach. The dissimilarity between Camel's base years and review years was not of a different magnitude than that between Camel's renegotiable and commercial business or than that among the various military tent manufacturers. The dissimilarity cited by the Trial Judge was an eminently sufficient reason to discount the weight accorded the comparison (as we discounted Comparisons X and Y), but it was

**37.** While the Trial Judge found Camel's renegotiable operations to be *more complex than its commercial operations* (and we take this into account in our "Character of Business" section, *infra*), he concluded that the profits of the same company, with the same management, and business acumen, competing against many of the same competitors in a market where "viable pricing mechanism" existed (the commercial market) would provide a valuable comparison against which to measure renegotiable profits. He bolstered this conclusion with the reasoning that a contractor should not be forced to earn less in dealing with the Government than it would if it refused Government contracts and dealt only in the commercial market.

**38.** The value of GFP is in the renegotiable sales total here for reasons detailed *supra*.

certainly not enough to compel *total* rejection, particularly when the comparative standards offered by the plaintiff were as flawed and difficult to apply as were the ones offered here.

It is conceivable that a plaintiff, in presenting a *prima facie* case, could introduce such an airtight wealth of economic data, could introduce such a complete and detailed analysis of its change in economic conditions or its change in realized profits, that a comparative standard as inexact and dissimilar as the Trial Judge determined defendant's base years analysis to be could be discounted almost to the point of rejection. However, in the situation we face here, where plaintiff has itself offered only the skimpiest of economic data, and has offered no explanation of its own upon which we could draw, concerning its apparently healthy increase in profits between base years and review years, defendant's asserted comparison (Comparison Z) should be balanced and weighed with the rest. In our effort to reconstruct normality, every comparison we can make will be helpful, so long as we allow for the relative shortcomings of each.

The defendant's asserted comparison with GFP included shows the following:

*Comparison Z*

| | | Total Sales | Renegotiable Sales | Renegotiable % Profit |
|---|---|---|---|---|
| Base Years | FY 1964 | $ 3,499,693.00 | $1,934,809.00 | 6.1 % |
| | FY 1965 | 4,591,568.00 | 2,503,541.00 | 4.7 % |
| Review Years | FY 1966 | 7,639,054.63 | 4,954,207.39 | 11.51% |
| | FY 1967 | 11,214,217.12 | 7,117,445.02 | 13.20% |
| | FY 1968 | 12,880,823.00 | 7,019,823.00 | 15.16% |

Based on a relative balancing as described above, we find that this standard of comparison (Comparison Z) is entitled to weight greater than Comparison X, but not as great as Comparison Y. While we find Comparison Y to be the most useful standard for determining a "starting point" in the instant case, we do not dismiss totally either Comparison X or Comparison Z; instead, we retain these useful comparisons to assist us in reconstructing "normality."

Regardless of which standard is accepted as a starting point, however, it appears that the profits realized by plaintiff on its renegotiable work during the review years were relatively high and that the Board's determination or some determination of excessiveness may have been proper. It remains to be seen, though, by an analysis of the statutory factors, weighted according to the comparisons upon which they rely, whether plaintiff is entitled to any favorable consideration sufficient to allow retention of those profits which now may appear to be excessive.

B. *Statutory Factors:*

█ (1) *Efficiency:* This, the most emphasized of the statutory factors, is the one factor for which we are *directed* to allow the renegotiated contractor "favorable recognition," where merited.[39] It appears that the Government has overstated its case a bit when it argues that the purpose of the Act is to ensure that "a contractor with experience and efficient equipment should pass on the benefits of its expertise to the government." As we have already stated, the purpose of the Act is to restore, to the greatest possible extent, a "normal" price/profit environment vis-a-vis the Government and a renegotiated contractor. One of the incentives for increasingly efficient operation on the part of a contractor is the expectation of increased profits resulting therefrom. Of course, if this in-

**39.** 50 U.S.C. App. § 1213(e)(1970). *See Mason & Hanger*, 518 F.2d at 1352, 207 Ct.Cl. at 123.

creased efficiency is solely an efficiency of scale resulting from the increased volume of Government procurement, the Government would not be remiss in expecting a return benefit, in the form of price reductions, from the contractor. For this reason, the type of efficiency asserted by plaintiff or defendant assumes just as much importance as the fact that certain efficiencies existed.

In the case now before us, plaintiff has relied on its efficiency as deserving of favorable recognition. It resorts primarily to comparisons of efficiency between itself and other military tent manufacturers (Comparison X). The evidence presented by the plaintiff with regard to efficiency seemed calculated to demonstrate that plaintiff delivered on its military contracts in a precise fashion—on time and within specifications—to a greater extent than did its competitors.[40] The difficulty with this qualitative description of efficiency is, of course, the impossibility of assigning a precise, quantitative amount of money which plaintiff should be allowed to retain in "favorable recognition." Any numerical factor assigned must, therefore, be somewhat arbitrary and in keeping with the "broad brush" approach previously discussed.

Because of this difficulty, defendant urges that no credit should be given for efficiency. Its expert witness in explaining how he had utilized base years (Comparison Z) to determine an exact amount of excessive profits, stated for the record his dissat-

isfaction with methodology which did not allow for specificity in assigning dollar values. While we may share his uneasiness with the inexactness of dollar values which must be assigned under some of the "qualitative" statutory factors, we may not ignore the dictates of Congress merely because exact dollar values may not be readily determinable.

The same expert witness testified that he had made no adjustments for statutory factors to his excessive profits determinations. He did, however, utilize certain exact cost data of various specific contracts (too limited, we think, for any overall conclusions) which showed that Camel's cost-per-tent figures had risen at a relatively quicker rate during the review years. His conclusion was that Camel had become relatively less efficient. The witness' failure adequately to respond to an attempt by the Trial Judge to determine whether other factors could have been responsible for the more rapid increase in costs,[41] indicated his inability to deal with items which could not be expressed in hard, cold, exact figures.

Yet difficulty of computation cannot be a ground for ignoring the vital statutory factor of efficiency. We agree with the Trial Judge that the witness did not give proper consideration to the relative efficiency factor in arriving at his conclusion and that plaintiff is entitled to "favorable recognition" (employing Comparison X—competitors)[42] as far as this factor is concerned.[43]

---

**40.** The Trial Judge apparently utilized evidence in the form of reports to the Renegotiation Board, submitted on the plaintiff, in determining that plaintiff was, in fact, more efficient than its competitors in this regard. We see no reason to upset that determination, since these reports, submitted by Government employees in the regular course of their employment (and, perhaps, militating against the Government's interest) have previously been recognized by this court as acceptable evidence, particularly "where a more detailed comparison" was lacking. *Butkin*, 544 F.2d at 506, 211 Ct.Cl. at 122.

**41.** Plaintiff, for example, hired a second shift, *at Government request* and realized a significant increase in training and supervisory costs. Although this may have shown up in the figures used by defendant's expert, it is not really a fair comparison. Plaintiff may also have incurred additional costs in its efforts to meet

contract and delivery specifications more regularly than other manufacturers. In addition, Mr. Katz revealed on cross examination that he was "speculating" on at least certain of the conclusions he attempted to draw from the cost figures concerning the "efficiency" of plaintiff.

**42.** As can be seen, our analysis produces a sort of grid framework within which the statutory factors must be considered. If all six factors (assuming the category of "other factors" remains unused) were analyzed employing all three comparisons present in this case, a total of eighteen different credit/no credit threshold determinations would be possible. However, for purposes of brevity, we shall make determinations only on those factors and comparisons asserted or disputed by the parties.

**43.** Camel, though not really asserting a base years comparison, introduced evidence which

(2) *Net Worth (capital employment):* In this statutory factor, the defendant has clearly carried the day.[44] Based on its Comparison Z, defendant, through its expert witness, has quantitatively demonstrated that the profits earned by Camel on renegotiable business during the review years were far in excess of those earned during the base years [45] insofar as return on net worth and capital employed are concerned. The Government demonstrated how, in the instant case, this statutory factor had constituted the sum total of the methodology employed in arriving at the exact dollar amount of the profits deemed excessive. While we sympathize with the Government's desire (and the obvious desire of its expert witness) for exactness and specificity, and while we are grateful for whatever expert testimony we can get in these thorny problems, we believe that almost total reliance on one statutory factor—even though it be quantitative and highly useful—detracts from the flexibility so vital to achieving the purposes of this Act.

We do, however, find the quantitative evidence of profits returned as compared to net worth and capital employed, despite its severely restricted scope and the inherent limitations in Comparison Z, to be quite useful in our attempts to reconstruct normality in the case at hand. But net worth is just one of the factors used; it should not be the only one. Defendant arrived at an average return on capital employed of 23.6% during the base years and then applied this figure to each of the review years to conclude that "reasonable" profits for each of those years would have been $203,490, $203,724, and $238,529, respectively.[46]

Defendant then performed similar computations [47] to arrive at an average 44.7% [48] return on net worth during the base years. Applying this figure to the review years, defendant's expert determined that reasonable profits would have been $186,041, $212,772, and $195,048, respectively.[49]

Thus, the total "reasonable profits" which defendant's expert witness would allow for three review years, is shown to be in the vicinity of $600,000. This is on total renegotiable sales for the three years of $19,091,475 (as determined in Part I, *supra*). If we were to accept this figure we would be allowing Camel a before tax profit of approximately 3% on its renegotiable sales, or as was astutely drawn out on cross examination of defendant's expert witness, an expected maximum retainable (after deducting for capital expenses necessary to undertake the Government contract) "increase in assets" of less than 1%.[50] Such

---

could tend to show that, through improvements in facilities and procedures, it actually increased its efficiency from the base years even though its operations became more complex and more difficult. While we do not deal with efficiency in a base years framework, this court has required an *increase* in demonstrated base years efficiency before allowing plaintiff credit toward an increase in base years profit. *See Mills Mfg. Corp. v. United States*, Nos. 607–71, 655–71, and 697–71, 571 F.2d 1162 (Ct.Cl. 1978).

**44.** Though plaintiff attempted to refute defendant's case on this factor through cross examination, it essentially offered no proof of its own.

**45.** The difficulties inherent in considering the "base years" as normal have been discussed *supra*.

**46.** As against actual profits on renegotiable sales during the review years (as determined in

Part I *supra*) of $570,135, $939,733, and $1,064,000, respectively.

**47.** In determining capital and net worth figures for FYs 1967 and 1968, the "excessive" profits for the previous FY(s) was first deducted out of the total.

**48.** This figure was adjusted upward by defendant to 48.18% for FYs 1967 and 1968.

**49.** *See* note 46, *supra*.

**50.** Two additional facts of interest were also raised on cross examination of Mr. Katz, defendant's expert witness. First, in answering a question concerning the actual "exactness" of his figures, he admitted that for two FYs (years that he later decided not to use as a "base year") his figures showed that plaintiff's costs were 108% of sales and that plaintiff still made a 5% profit. This would appear to cast some doubt on the asserted accuracy of his system. Also, in a colloquy with the court, the witness testified that if, during his selected base years,

figures are hardly likely to bring a flood of competitors into the market for Government contracts; they are below the relative percentage profits indicated in every one of the comparative standards, and they are roughly half those figures which the Board would have been willing to accept.[51] Nonetheless, in this *de novo* proceeding, such quantitative evidence is again invaluable in our search for "normality." [52]

Plaintiff virtually ignored and did not rely on the statutory factor of net worth. Defendant has carried its burden of proof and plaintiff is clearly entitled to no favorable recognition here.

██ (3) *Extent of Risk Assumed:* We agree with the Trial Judge that plaintiff has demonstrated that it incurred, in its renegotiable business, certain risks that it would not have faced had it not dealt with the Government. Major additional risks included the risk of sacrificing a developing commercial market, the risk of guaranteeing that its products would meet Government specifications which were far in excess of any commercial standard,[53] and the risks inherent in hiring and training another shift of workers solely at the request of the Government.

Primarily, it appears from the record that defendant's witness failed to accord plaintiff credit for the risk, which he admitted it assumed, because plaintiff had planned for it well and had, therefore, successfully

weathered any risk it had assumed. Clearly, the total nonexistence of risk and the successful circumnavigation of existent risks are two entirely different matters. Defendant's risk argument is worthy of little credence.

While we do agree with Mr. Katz that a manufacturer employing GFP will suffer significantly fewer risks than will a manufacturer seeking out sources of supply on his own (and here we can take into account the difficult-to-quantify difference we perceive between a GFP recipient and a raw materials purchaser),[54] we believe that Mr. Katz' basic testimony on this factor is of little assistance, and may well have been only retrospective in nature.

Thus, plaintiff has demonstrated that it is entitled to credit for risk assumed at least vis-a-vis the commercial market. We fail to see from the record, however, how acceptance of these risks would entitle plaintiff to any more favorable consideration than any other military tent producer who apparently would have been compelled to assume many of the same risks.

Therefore, if we employ Comparison Y (Commercial Business) plaintiff is entitled to credit for risk assumed; employing Comparison X (Competitors) there would be no such entitlement.

██ (4) *Nature and Extent of Contribution to the Defense Effort:* Under this statutory factor, we again have plaintiff plead-

plaintiff had shown only a 1% profit, then a 2% profit during the review years would be excessive. Defendant's expert is clearly long on reliance on "exact figures" but short on reasonableness which is the heart of renegotiation.

**51.** One possible reason for this discrepancy is that Board regulations do not place "special emphasis" on net worth and return on capital whereas Mr. Katz testified that he relied "primarily" on that single statutory factor.

**52.** While the presence of expert analysis of this quantitative evidence makes it far more probative than the bare figures rejected in *Blue Bell, Inc. v. United States,* 556 F.2d 1118, 1124, 213 Ct.Cl. 442, 449 (1977), a full comparative analysis of industry-wide figures could have made plaintiff's returns on capital and net worth far more determinative.

**53.** This included the risk of possible non-acceptance by the Government of tents which failed to pass the "cup test," in which water was poured into a "cup" formed by indenting a tent along a seam to determine the watertightness of the seam. This "cup test" far exceeded any requirements of the commercial market.

**54.** Such a qualitative consideration of the benefit accorded a contractor by the receipt of GFP is the only possible approach on the record before us. This court has previously rejected attempts by Trial Judges to quantify this recognized benefit to the contractor as being "too speculative," *see Major Coat, supra,* 543 F.2d at 107–08, 211 Ct.Cl. at 19–20, or without "record evidence," *see Blue Bell, Inc. v. United States,* 556 F.2d 1118, 1125, 213 Ct.Cl. 442, 451 (1977).

ing for credit because of apparent contributions and defendant's expert witness denying that credit because of his inability to assign a specific dollar value to it.

We agree with defendant's expert and the Trial Judge that Camel made several contributions to the defense effort, but we do not agree with defendant that these contributions were "minimal." The record clearly indicates that Camel instituted a new work shift, solely at Government request, when there was no otherwise compelling economic reason to do so. While an additional shift might ordinarily be seen as a method of increasing profits, this shift was begun in the face of a tight labor market in which new supervisory personnel were nearly impossible to obtain. The detrimental effects of this action on efficiency and risks assumed have been previously taken into account, but we cannot lose sight of the fact that the action was taken totally in an attempt to turn out more tents for the war effort.

In addition, there is evidence in the record to demonstrate that Camel assisted competitors and potential competitors alike—on every occasion in which it was requested to do so by the Government in order to increase the country's tent output to meet requirements. It conducted tours of the plant and exchanged technical information with representatives of these other firms and even went so far as to exchange information on scarce sources of component supply.[55] While such actions may also have been taken by certain of Camel's competitors in an effort to assist the Government in obtaining the greatest number of tents in the shortest possible time, it seems clear to us that, barring some desire to contribute to the defense effort, a manufacturer would not supply "aid and comfort" to a competitor, particularly when the competitor could very well be the one who subsequently engages in a life and death struggle for scarce post-emergency commercial business.

Further, both the addition of an extra shift and the provision of "aid and comfort"

to competitors are contributions apparently made above and beyond those made during the base years.

We agree with the Trial Judge that defendant failed to carry its burden of proof against plaintiff's asserted contributions to the defense effort and that plaintiff is certainly entitled to credit under this factor (employing Comparisons X, Y or Z).

■ (5) *Character of Business:* The next statutory factor directs that we consider the character of the plaintiff's business "including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over; . . ." Much of the evidence adduced at trial was apparently directed at this statutory factor. The Government introduced numerous witnesses intimately familiar with the military tent industry in an attempt to demonstrate that there was very little unique or noteworthy about Camel's operations, while plaintiff's witnesses testified at length concerning the numerous, constantly increasing complexities which could be found in Camel's manufacturing processes, and the increasingly sophisticated products which it produced throughout the base years and review years.

Much of this testimony has already been considered in determining appropriate standards of comparison, *supra.* In attempting to determine whether specific credit is due for plaintiff's character of business, however, we are met with the fact that neither party adduced evidence concerning the "rate of turn-over" of products or inventory.

In addition, while it is evident that Camel did not subcontract any of its Government work, it is unclear how this fact should affect any of the comparisons since the degree of subcontracting present in the rest of the industry or in commercial business was never clearly brought to light. We cannot diminish a contractor's profits merely because he retains all the work, and all

---

**55.** This type of contribution has previously been given favorable consideration under this

statutory factor in *Butkin*, 544 F.2d at 510–11, 211 Ct.Cl. at 130–31.

the responsibilities and obligations himself.[56]

Another sub-item under this statutory factor is the "source and nature of materials." We have already discussed in some detail the problems encountered in attempting adequately to reconcile the GFP situation with any kind of a "normal" business operation in which raw materials are purchased by the contractor. We believe it is evident that the risks assumed by the contractor are lessened somewhat in the GFP environment. This slight benefit of GFP to the contractor has already been accounted for by discounting slightly the credit otherwise due to Camel under the risk factor. No further consideration of the GFP issue is necessary here.

The final remaining sub-item concerns "complexity of manufacturing technique." Under this sub-item, the Trial Judge determined that plaintiff's product mix became more complex during the review years than it had been during the base years and that (in a quest for improved efficiency) plaintiff's manufacturing operations became more complex during the review years than they had been during the base years. Further, he also found that there was sufficient evidence in the record concerning the relative complexity of manufacturing military tents and civilian tenting products to determine that Camel's renegotiable tenting operations were significantly more complex than its commercial operations. We agree.

We find that plaintiff has made a *prima facie* case for mitigating treatment under this statutory factor and that defendant has not carried its burden of proof. Therefore, plaintiff is entitled to credit for the complex character of its business if we employ Comparison Y (commercial business) or Comparison Z (base years).

(6) *Reasonableness of Costs and Profits:* In many respects, this statutory factor encompasses the ultimate issue which must be decided in a renegotiation case. We address the reasonableness of plaintiff's costs under the all-important efficiency factor

and the reasonableness of profits is, in essence, discussed in the Appropriate Standards of Comparison section, *supra*. In an attempt to avoid further repetition of these items, we will discuss them in conjunction with our conclusions as to excessive profits.[57]

C. *Summary*

As can be seen from the discussion above (Part II), the plaintiff has made out its *prima facie* case in pleading several of the statutory factors. Since, according to *Lykes Bros.*, the Government bears the burden of proving both the fact and the amount of excessive profits, the Government must rebut plaintiff's *prima facie* case on these factors or Camel will be awarded credit.

The Government, in the present case, has made extensive use of expert testimony in its attempt to rebut the plaintiff's qualitative claims for credit under the statutory factors. While we find the analysis of this expert highly useful and helpful in our reconstruction of "normality," we are nonetheless struck by the inability of defendant's expert to weave the highly flexible and qualitative statutory factors analysis into his essentially quantitative financial assessment of which profits were excessive. Thus, although defendant made an excellent showing with regard to the quantitative statutory factor of net worth and capital employed, its response to such qualitative factors as risk assumed and contribution to the defense effort is insufficient to rebut plaintiff's claims for credit under those factors.

Plaintiff, on the other hand, has placed entirely too much emphasis on qualitative claims and has even failed to supply figures to back up those claims when such figures may have been available only in its own records. Thus, while plaintiff claims credit for efficiency, it adduces no evidence as to what extent its efficiency increased from base years to review years or to what quantitative degree its efficiency was better than that of its competitors. Admitted-

---

**56.** See *Butkin*, 544 F.2d at 509–10, 211 Ct.Cl. at 128–29.

**57.** There is a so-called seventh factor, "others," which has not been specifically addressed by either party. See note 3, *supra*.

ly, certain of the statutory factors—especially contribution to the defense effort—are simply not susceptible of numeric or quantitative proof. *However, where such evidence can be offered by the plaintiff, it should be offered by the plaintiff.* Generalities may be sufficient to demonstrate a *prima facie* entitlement to some credit under a statutory factor, but they simply cannot be accepted as demonstrating how much credit is due. Generalities are insufficient to prove a quantitative entitlement and, therefore, leave the court in the unenviable position of not only balancing plaintiff's generalities against defendant's specifics to determine whether defendant has carried its burden, but also of assigning some arbitrary value to plaintiff's generalities once it has been determined that defendant's proof was insufficient to carry its burden. A plaintiff who relies solely on general testimony as to efficiency, character of business, net worth, reasonableness of costs and profits, or extent of risk assumed, and who supplies no in depth economic analysis—which ties these factors together to explain a rise in profits—to assist in our reconstruction of normality, cannot be heard to complain that the credit which we have been compelled arbitrarily to attribute to a specific factor is monetarily insufficient.

In the case now before us, Camel relied heavily on revised accounting and general claims of credit under certain mitigating statutory factors in challenging the Board's determination that $1,375,000 of its renegotiable profits during the review years was excessive. When the accounting is revised in accordance with Part I of this opinion, Camel's profits exceed those of most of its competitors, those of its commercial business, and those of its base years by a considerable margin. Plaintiff's asserted credits, though general, thus assume

utmost importance in our attempt to determine why these profits appear high.

Defendant attempts to move us in the other direction by arguing, based on a consideration of primarily one statutory factor, that the Board's $1,375,000 determination is too favorable to Camel and that, in fact, an excessive profits determination of $1,842,-000 would still leave Camel with "reasonable" profits.

Much discussion has taken place in previous cases concerning the proper "starting point" for our application of various credits due plaintiff as a result of our "statutory factors" analysis. In *Major Coat,* we utilized the after-renegotiation profit figures of renegotiable firms manufacturing similar products, 543 F.2d at 121–22, 211 Ct.Cl. at 42–44; in *Butkin* we employed a base years' profit figure, 544 F.2d at 505, 211 Ct.Cl. at 121; and, in *Blue Bell, Inc.* we began with a figure derived by allowing plaintiff the same percentage profit on renegotiable work as he received on his commercial work, 556 F.2d at 1126, 213 Ct.Cl. at 453. The most appropriate starting point, then, varies according to the facts of the specific case.

As we have previously discussed in our Appropriate Standards of Comparison section (Part II, A., *supra*), we perceive difficulties in all of the comparative standards asserted by both parties in the case at hand. However, for the reasons discussed therein we hold, following our precedent in *Blue Bell, Inc.* that the most acceptable starting point in the present case is one put forward by the plaintiff, namely Camel's percentage profits on its commercial business. Even after taking note of all the Government's asserted difficulties with this standard, it is superior to either of the others advanced.

The results of utilizing percentage of commercial profits as a starting point may be depicted as follows:

| FY | % Commercial Profit | Renegotiable Sales [58] | "Starting Point" Renegotiable Profits |
|---|---|---|---|
| 1966 | 4.3 | $4,581,057 | $196,985 |
| 1967 | 4.6 | 6,475,588 | 297,877 |
| 1968 | 6.6 | 6,376,684 | 420,861 |

**58.** These renegotiable sales figures differ from the totals determined in Part I because they reflect the diminution which must occur as renegotiable profits are reduced.

As this chart demonstrates, if we were to allow Camel the same percentage return on its renegotiable business as it received on its commercial business, Camel's review years renegotiable profits would be $196,985, $297,877, and $420,861, respectively. This would mean, of course, that Camel's excessive profits would total $1,658,145,[59] and an amount larger than the one originally assessed by the Board.[60]

Although we believe Comparison Y (Commercial Business) to be the most accurate starting point, this does not mean Comparisons X (Competitors) and Z (Base Years) may not be useful in producing a just result. Assuming, as a starting point, a renegotiable percentage profit for Camel equivalent to its percentage profit in its own commercial sales, Camel's profit picture in the other two comparisons would be depicted as follows:

*Comparison X*[61] *(Competitors)*

| FY 1966 | Plaintiff | Others | No. of Others |
|---|---|---|---|
| Sales range | $2.8 million | $1.4–2.8 million | (4) |
| Actual profit | 20.50% | 9.2%–34.4% | |
| After Renegotiation | 8.2% * | 9.2%–15.4% | |

| FY 1967 | Plaintiff | Others | No. of Others |
|---|---|---|---|
| Sales range | $3.8 million | $1.1–$6.7 million | (7) |
| Actual profit | 24.68% | 6.9%–39.1% | |
| After Renegotiation | 9.4% * | 6.9%–15.4% | |

| FY 1968 | Plaintiff | Others | No. of Others |
|---|---|---|---|
| Sales range | $3.8 million | $1.1–$5.4 million | (11) |
| Actual profit | 28.01% | 7.6%–50.0% | |
| After Renegotiation | 13.3% * | 6.8%–15.6% | |

*Comparison Z (Base Years)*

| | | Total Sales[62] | Renegotiable Sales | Renegotiable % Profit |
|---|---|---|---|---|
| Base Years | FY 1964 | $ 3,499,693 | $1,934,809 | 6.1% |
| | FY 1965 | 4,591,568 | 2,503,541 | 4.7% |
| Review Years | FY 1966 | 7,265,905 | 4,581,057 | 4.3% |
| | FY 1967 | 10,572,360 | 6,475,588 | 4.6% |
| | FY 1968 | 12,237,684 | 6,376,684 | 6.6% |

From these additional comparisons, it can be seen that percentage commercial profits yield a "ballpark" starting point for renegotiable profits. While Comparison Z would appear to demonstrate that allowing Camel to retain only the same percentage profit on its renegotiable sales as it earned on its commercial sales would keep Camel within the same profit range as its own base years, Comparison X shows that restricting Camel to a commercial percentage profit return on its renegotiable sales would place Camel on

**59.** Total profits of $2,573,868 minus total allowable profit of $915,723 = excessive profit of $1,658,145.

**60.** This amount, $1,658,145, though more than the $1,375,000 determined excessive by the Board, is less than the $1,842,000 figure which the Government's expert witness urged as excessive profits.

**61.** These figures are GFP-exclusive.

* These figures for Camel would, of course, be after action by this court and the diminution of sales discussed in note 58, *supra.*

**62.** *See* note 58, *supra.*

the lower fringe of the military tent manufacturers group insofar as renegotiable profits are concerned. In fact, retention of only this much profit would place Camel well below the approximately 15.5% profit level which the Board appears to have established as a reasonable limit for this group.

It must be remembered, however, that this commercial percentage profit represents merely a starting point and that it must be adjusted according to our analysis of the mitigating statutory factors. From this previous analysis, we determined that plaintiff was entitled to credit (as against his commercial business) in the areas of risk assumed, contributions to the defense effort, and character of business.

In previous cases, this court has fashioned credit for statutory factors in a variety of ways. We have utilized percentage allowances, see Blue Bell, Inc., 556 F.2d at 1126, 213 Ct.Cl. at 453; see also Mason & Hanger, 518 F.2d at 1365, 207 Ct.Cl. at 146; assignment of dollar figures drawn from the record to the "value added" under each statutory factor, see Butkin, 544 F.2d at 509–10, 211 Ct.Cl. at 128–29; and fractional allowances of actual profit which place plaintiffs in a proper relative position on an industry-wide basis, see Major Coat, 543 F.2d at 123–24, 211 Ct.Cl. at 47–48. The court has shown an uneasiness in utilizing such devices, see, e. g., Major Coat, 543 F.2d at 124, 211 Ct.Cl. at 48, but has generally decided that a broad brush approach is appropriate so long as the evidence in the record is sufficient to permit a responsible judgmental adjustment in determining a reasonable profit for the renegotiated contractor. Id. While we have previously pointed out the relative shortcomings of the record here, we believe that sufficient evidence does exist to make such adjustments.

Accordingly, as a result of our deliberations on the facts presented in the record, to create "normality" we determine that, as a matter of judgment, plaintiff is entitled to a profit adjustment of an additional 4 percent of its renegotiable sales. This is over and above the percentage earned on its commercial sales, in order to compensate Camel for credit due under the statutory factors of risk assumed, contributions to the defense effort, and character of business as detailed above. The 4 percent credit will have the following results.

| FY | % Commercial Profit | % Commercial Profit + 4% Renegotiable Credit | Renegotiable Sales [63] | Renegotiable Profit after Credit |
|---|---|---|---|---|
| 1966 | 4.3 | 8.3 | $4,780,885 | $396,813 |
| 1967 | 4.6 | 8.6 | 6,758,984 | 581,273 |
| 1968 | 6.6 | 10.6 | 6,661,994 | 706,117 |

Thus, after allowing Camel credit under the mitigating statutory factors, as directed by the Act, we determine that Camel's reasonable profits for the three review years totaled $396,813, $581,273, and $706,171, respectively, and that its excessive profits total $889,611.[64]

This resolution of the dollar profits not only places Camel in its proper position relative to its own commercial business, but it also appears, interestingly, to approximate "normality" with regard to each of the other Comparisons. These results may be depicted as follows:

63. See note 58, supra.

64. Total profits of $2,573,868 minus total allowable profits of $1,684,257 = excessive profits of $889,611.

*Comparison X [65] (Competitors)*

| FY 1966 | Plaintiff | Others | No. of Others |
|---|---|---|---|
| Sales range | $2.8 million | $1.4–2.8 million | (4) |
| Actual profit | 20.50% | 9.2%–34.4% | |
| After Renegotiation | 15.2% | 9.2%–15.4% | |

| FY 1967 | Plaintiff | Others | No. of Others |
|---|---|---|---|
| Sales range | $3.8 million | $1.1–$6.7 million | (7) |
| Actual profit | 24.68% | 6.9%–39.1% | |
| After Renegotiation | 16.8% | 6.9%–15.4% | |

| FY 1968 | Plaintiff | Others | No. of Others |
|---|---|---|---|
| Sales range | $3.8 million | $1.1–$5.4 million | (11) |
| Actual profit | 28.01% | 7.6%–50.0% | |
| After Renegotiation | 20.5% | 6.8%–15.6% | |

*Comparison Z (Base Years)*

| | | Total Sales [66] | Renegotiable Sales | Renegotiable % Profit |
|---|---|---|---|---|
| Base Years | FY 1964 | $ 3,499,693 | $1,934,809 | 6.1% |
| | FY 1965 | 4,591,568 | 2,503,541 | 4.7% |
| Review Years | FY 1966 | 7,465,732 | 4,780,885 | 8.3% |
| | FY 1967 | 10,855,756 | 6,758,984 | 8.6% |
| | FY 1968 | 12,522,994 | 6,661,994 | 10.6% |

Looking at these two comparisons in our effort to insure as close an approach as possible to "normality," we find that, in Comparison X, Camel's combined average profit rate for the review years was 17.7%, 2.2% above the 15.5% generally accepted as "normal" for this industry by the Board during these years. However, as we have previously stated, we do not know the specifics of the Board's deliberations and do not, therefore, know the basis on which the Board awarded, or did not award, credit. We do know, however, that we are directed by the Act to accord Camel favorable recognition for efficiency. We believe a 2.2% premium for Camel's efficiency vis-a-vis other manufacturers (in its field) [67] is not out of line as a means of according this favorable recognition.

In addition, from Comparison Z we can see that Camel is accorded an increase in profits over the base years. The evidence demonstrated that plaintiff's contributions to the defense effort, and changes in its character of business entitled it to credit in relation to its base years profit. We believe the increases in profit demonstrated by Comparison Z represent proper credit under these factors.

In short, we hold that the "4% solution" outlined above recreates, to the greatest possible extent, a "normal" business environment [68] and properly rewards plaintiff in

---

**65.** This data is on a GFP exclusive basis as obtained from the Board.

**66.** Review year sales reflect diminution of profits as in note 58.

**67.** *See* our discussion under the "efficiency" section, *supra* at 37.

**68.** With regard to our assessment of "normality," Camel's own Annual Report for the FY ending September 30, 1973, informed its stockholders that, in the opinion of counsel, these renegotiation actions before the Court of Claims could result in Camel's refunding to the Government excessive profits possibly amounting to $610,000 (less applicable tax credits).

**312**

the circumstances of these cases, for certain increased efforts deemed important by Congress.

Finally, in Part I, we hold that plaintiff has failed to carry its burden of proof in the resolution of disputed accounting data and that, with the exception of the exclusion of GFP, defendant has produced the correct accounting in this case. In Part II, we hold that the evidence in the record (including those comparisons asserted by the plaintiff) demonstrates the excessive nature of plaintiff's profits, but that defendant, with the exception of the single statutory factor of net worth, has failed to prove that the amount of plaintiff's excessive profits was as great as defendant claimed.

## CONCLUSION OF LAW

Accordingly, judgment is hereby entered for the United States on its counterclaims for each of the review years in the amounts of $173,322, $358,460, and $357,829, respectively, (a total of $889,611) with each of these amounts to be decreased by appropriate tax credits and increased by interest as allowed by law.